HOUSEHOLD FINANCE CORPORATION
*v.* BRIDGE

[No. 95, September Term, 1968.]

*Decided March 5, 1969.*

532

The cause was argued before HAMMOND, C. J., and MAR-
BURY, BARNES, FINAN, SINGLEY and SMITH, JJ.

*Robert L. Kay,* with whom were *Harry Protas* and *Protas &
Kay* on the brief for appellant.

*John T. Bell,* with whom were *Charles W. Bell* and *Bell &
Bell* on the brief, for appellee.

FINAN, J., delivered the opinion of the Court.

In *Carr v. Watkins,* 227 Md. 578, 177 A. 2d 841 (1962),
Judge Hammond (now Chief Judge) expressing the opinion of
this Court stated, that Maryland would recognize in a "proper
case" the right of a person to redress for an unwarranted in-
vasion of his privacy.

We now have before us an appeal from a judgment on the
verdict of a jury in the Circuit Court for Prince George's County
awarding the appellee the sum of $3,000.00, against the appel-
lant for the latter's invasion of her privacy.

The question is : is this a "proper case"?

On November 1, 1966, Mrs. Gloria May Bridge (appellee)
and her father, Frank Fortyune, filed suit against the House-
hold Finance Corporation (appellant) in the Circuit Court for
Prince George's County, alleging damages for invasion of pri-
vacy. Appellant filed a general denial to appellee's allegation and
also filed a counterclaim against appellee and her father for
$150.00, the balance alleged to be due on a loan to them. The
events which led to the filing of the suit are as follows :

In 1964 appellee lived in Rockville, Maryland and was em-
ployed as a cosmetologist in a beauty salon. That year she pur-
chased a Corvair automobile from Eaton Chevrolet in the Dis-
trict of Columbia. The financing arrangements were made by the
automobile dealer through the appellant. Frank Fortyune, ap-
pellee's father, executed the loan papers which obligated him to
pay the loan at appellant's branch office in Seat Pleasant, Mary-
land. However, even up to the time that she testified in court,

the appellee thought that she was the maker of the note and the father, the endorser.

Appellee took possession of the Corvair and, instead of her father, she made the monthly payments directly to the appellant. Appellee followed this course of action until October 1, 1965, at which time she was involved in an automobile accident which totally destroyed the Corvair and caused her to be hospitalized with serious injuries. At the time of the accident there was a $900.00 balance due on the loan. Appellee notified appellant of the accident and that she no longer had the car, that she could not continue payments and that her insurance carrier was going to handle the matter. Subsequently the appellant received $750.00 from Nationwide Insurance Company, the appellee's insurance carrier.

This payment was made to appellant because it was named as loss-payee under the insurance policy between Nationwide and the appellee. This $750.00 reduced appellee's balance due from $900.00 to $150.00. The appellant contacted appellee and her father in connection with the remaining $150.00 which appellant felt was due after the insurance monies were applied to the loan balance. It is at this point that a conflict develops in the testimony of the respective parties.

Appellee testified that she received a number of telephone calls from a respresentative of the appellant who identified himself as Mr. Bullock, appellant's credit manager. She claims that the first call was made sometime late in October, 1965, and that it was received around 10:00 P.M. at her home. Appellee testified that she received a total of six or more calls at her home and her testimony as to the content of the calls was as follows:

> "Q. And what was the subject matter? What was the conversation of these phone calls? A. Well, he said that he was—that I had to pay this loan, and I said, well, my insurance agent has taken care of that or is going to take care of it; I am out of work. When I went to work and I had got them, he would say you have to pay this money, that there's no way out, and I told him I didn't owe any money, I'm sorry; I wasn't going to pay when I didn't owe. He said, 'But you do.'
> \* \* \*

"Q. What else did this Mr. Bullock say to you, Mrs. Bridge? A. Well, he said that he could ruin my credit and I could lose my job, and that anything that I owned could be taken from me and that he would get the money regardless, and that I owed this money and he was responsible for it where he was employed and he wasn't about to take it out of his pocket and pay it, that I was going to pay it.

"Q. Did he say anything else? A. Yes, he said, 'You can be put in jail for this.'

"Q. Did he say anything else? A. Well, he said so many things that—you want me to say everything he said?

"Q. I certainly do. A. Well, he said that—'We have a way of getting our money and it will ruin your reputation.' "

Appellee also testified that there were two calls made to her employer and that he confronted her about them, as a result of which she had apprehensions that she might lose her job.

Appellee's father, Mr. Fortyune, testified that during this same period of time he too was receiving calls from appellant, three at his shop and two at his home. Mr. Fortyune told Mr. Bullock that appellee had taken charge of the payments and that he did not owe appellant any money. Appellant's reply was alleged to be that somebody owed them money and someone was going to have to pay it.

Appellee alleged in her declaration that the action of the appellant had caused her to suffer mental anguish, humiliation and embarrassment, and that she was exposed to public contempt and ridicule, that her privacy had been invaded and that the dignity of her home and her reputation in the community had been violated. However, on cross-examination she testified that her credit had not been affected, she had not lost her job, she had no property taken from her, she was not put in jail; to her knowledge no third person, other than her employer, had been told of her alleged indebtedness, and that her salary had not been affected as a result of appellant's phone calls. Appellee also testified that the calls began in October, 1965, and ended after

she had consulted with her counsel and had initiated suit in November, 1966.

At the close of appellee's case, the appellant moved for a directed verdict, which was denied.

The appellant called as its only witness Mr. W. David Bullock, who in 1964 was the branch manager of the appellant's Seat Pleasant office. Mr. Bullock testified that he had loaned money to Mr. and Mrs. Fortyune but not to appellee, and that a 1963 Corvair was security for such loan. He testified that payments on the loan had been regularly made until the car was involved in the accident which occurred during October, 1965. He recounted his efforts to collect the $150.00 balance due on the loan after the appellant had received the proceeds from the appellee's insurance policy. He could only recall having one conversation with the appellee and denied having ever called her at her place of employment; claiming that the appellant never knew of her place of employment because the appellee had not signed the note. He denied making any threats to the appellee as alleged in her testimony. In sum, he stated that he had called the appellee once and her father, five times; that no call was made after 8:30 P.M. and that the nature of the calls was an insistent but not intemperate demand for payment.

At the close of the appellant's case, appellant renewed its motion for a directed verdict which was again denied, and the appellant's counterclaim against the appellee was dismissed.

The jury returned a verdict in favor of the defendant (appellant) in the action brought by Frank Fortyune for invasion of privacy; and against Fortyune and in favor of appellant on its counterclaim for $150.00. The jury returned a verdict in favor of the plaintiff (appellee), Gloria May Bridge and against the appellant for $3,000.00 for damages resulting from an invasion of privacy. The appellant on this appeal contends that the trial court erred in denying its motion for a directed verdict at the conclusion of the appellee's case.

There is little need to revisit the ground covered by Chief Judge Hammond in *Carr v. Watkins,* 227 Md. 578, 177 A. 2d 841 (1962), wherein he laid the foundation for the recognition by this Court of a cause of action for an invasion of privacy, even

though the communications be oral; there is an array of cases and authorities cited in *Carr*.

The instant case does not reach us on an appeal from the ruling of the lower court sustaining a demurrer to the declaration stating the cause of action, as did *Carr*. In the case at bar, on the authority of *Carr*, the lower court recognized the right of action and heard the case on its merits. We must now decide whether the evidence presented on the question of the invasion of privacy, was legally sufficient to warrant the consideration by the jury of that issue. To that end it is helpful to review the elements which constitute an action in tort for invasion of privacy.

When *Carr* was decided in 1962 the opinion paraphrased the *Restatement of Torts,* in the following language:

> "4 *Restatement, Torts,* Sec. 867 [1939] states the law to be that 'A person who unreasonably and seriously interferes with another's interest in not having his affairs known to others or his likeness exhibited to the public is liable to the other.' Comment d says in part: 'The rule stated in this section is not dependent upon conduct which, aside from the invasion of privacy, would be tortious, such as trespass to land or chattels or defamation. * * * *liability exists only if the defendant's conduct was such he would have realized that it would be offensive to persons of ordinary sensibilities.* * * * The damages whether nominal, compensatory or punitive can be awarded in the same way in which general damages are given for defamation.'

> "The *Restatement* further points out in Comment a to Sec. 867 that the tort of invasion of privacy in some aspects is similar to the interest in reputation which is the basis for an action for defamation, since both interests have relation to the opinions of third persons. On the other hand, unlike defamation, the right of action in invasion of privacy does not depend on the falsity of a statement or communication which amounts to such an invasion. *Prosser,* Torts (2d ed.), p. 638; Warren and Brandeis, 'The Right of Privacy.' 4 Harv

L. Rev. 193, 218." (Emphasis supplied.) *Id.* at 586-587.

The above referred to sections of the Restatement were prepared by Professor Warren A. Seavey and, although published in 1939, represented the latest pronouncement by the *Restatement* on the law of invasion of privacy, which admittedly was in a state of flux.

The whole area of invasion of privacy has been brought into better focus in the past several years and its present status is best expressed by Professor Prosser in his *Handbook of the Law of Torts,* (3d ed. 1964) Ch. 22, p. 832, wherein it is stated:

> "The early cases in all jurisdictions were understandably preoccupied with the question whether the right of privacy existed at all, and gave little or no consideration to what it would amount to if it did. Today, with something over three hundred cases in the books, some rather definite conclusions are possible. What has emerged is no very simple matter. *It is not one tort, but a complex of four. The law of privacy comprises four distinct kinds of invasion of four different interests of the plaintiff,* which are tied together by the common name, but otherwise have almost nothing in common except that *each represents an interference with the right of the plaintiff 'to be let alone.'* "
> (Emphasis supplied.)

Professor Prosser is now the Reporter for the *Restatement,* covering the sections on invasion of privacy, and in Tentative Draft No. 13, published April 27, 1967, of the *Restatement of the Law, Second, Torts* there is found listed in § 652A the four different *kinds* of invasions of privacy:

> "§ 652A. *Meaning of Invasion of Privacy*
> The Right of Privacy is Invaded When There Is
> (a) Unreasonable intrusion upon the seclusion of another, * * *
> (b) Appropriation of the other's name or likeness, * * *

(c) Unreasonable publicity given to the other's private life, * * *

(d) Publicity which unreasonably places the other in a false light before the public, * * *."

The text writers and authorities make it clear that an invasion of the right of privacy by anyone of the above four courses of conduct may give rise to a cause of action and, on occasion, there may be an overlapping or concurrent invasion by any or all of the above means working toward the injury of the plaintiff. *Restatement Second,* 652A, Comment d.

Bringing these concepts to bear on the facts of the instant case, it is obvious, that we are concerned only with an invasion of privacy arising out of "Unreasonable Publicity" given to a private fact, or "Unreasonable Intrusion," or both. There is nothing in the record in this case suggesting an invasion of privacy by way of "Appropriation" or "Publicity Which Unreasonably Places the Other in a False Light Before the Public."

Therefore, we address ourselves to the questions of "Unreasonable Intrusion," and "Unreasonable Publicity" given to private facts. We shall first discuss an invasion of privacy by the latter course of conduct, because we may dispose with this question of whether there was "Unreasonable Publicity" given to the appellee's status as a debtor, without difficulty; this accordingly, will enable us to devote more attention to the question of "Unreasonable Intrusion," which we think represents the main thrust of the appellee's case.

The question of "Unreasonable Publicity of a Private Fact" in this case, centers around the communication between the creditor (appellant) and the debtor's (appellee's) employer.

The cases involving communication by the creditor to the debtor's employer necessarily turn on the question of whether or not the communication to the employer could be termed reasonable or unreasonable.

The leading case in this area, although not from a court of last resort, would appear to be *Patton v. Jacobs,* 118 Ind. App. 358, 78 N.E.2d 789 (1948). In that case Jacobs, a doctor, employed a collection agency to collect a bill for professional services ren-

dered by him to Patton. In its effort to make the collection and for the purpose of coercing Patton into paying, the agency wrote two letters to Patton's employer, the Veterans Administration. In finding no invasion of privacy the court said:

"* * * If the appellant's complaint pleads a case for the invasion of her right of privacy it lies solely in the fact that the appellees, in an effort to collect a bill, brought the matter to the attention of the appellants' employer through a series of letters in which the employer's aid was solicited and the facts and circumstances of the indebtedness were detailed and in the further fact that in the course of writing said letters to the employer's appropriate executive officer, the same were read by numerous clerks or other office employees. *It must be borne in mind that an employer has a natural and proper interest in the facts relative to debts owed by his employees.* * * * He [employer] is not in a category with the general public which cannot have any legitimate interest in a purely private matter between a creditor and a debtor. * * * an employer has a right to know the status of the financial obligations of his employees and, while we cannot say that a creditor of an employee owes the employer a duty in that regard, it is difficult to follow a course of reasoning that concludes that the employee's right of privacy has been invaded by giving his employer information which the employer has a right to have. *In other words an employee has no right of privacy as against his employer in the matter of the debts he owes and a creditor who gives such information to the employer, unaccompanied by slanderous, libelous, defamatory or coercive matter, incurs no liability in so doing.* * * *." (Emphasis supplied). *Id.* at 791-792.

See *Harrison v. Humble Oil & Refining Company,* 264 F. Supp. 89 (D.S.C. 1967); *Cunningham v. Securities Investment Co. of St. Louis,* 278 F. 2d 600 (5th Cir. 1960); *Berrier v. Beneficial Finance, Inc.,* 234 F. Supp. 204 (D. Ind. 1964); *Tollefson v. Safeway Stores,* 142 Colo. 442, 351 P. 2d 274

(1960) ; *Gouldman-Taber Pontiac, Inc. v. Zerbst,* 213 Ga. 695, 100 S.E.2d 881 (1957) ; *Voneye v. Turner,* 240 S.W.2d 588 (Ky. 1951) ; *Davis v. General Finance & Thrift Corp.,* 80 Ga. App. 708, 57 S.E.2d 225 (1950) ; *Lewis v. Physicians and Dentists Credit Buerau,* 27 Wash. 2d 267, 177 P. 2d 896 (1947).

In the case at bar, viewing the actions of the creditor in contacting the employer, in light of the cases we have just cited, we do not believe that if the appellant's action had amounted to no more than a communication with the employer as revealed by the record that it would have been guilty of any conduct which transgressed reasonable bounds, and hence, would not constitute an invasion of the appellee's privacy.

As a prelude to a discussion of "Unreasonable Intrusion," we call to mind that we have elsewhere stated that the question of how far a creditor may go to collect his debt must be decided on the individual facts of each case, but usually on the ground of reasonableness. It is generally recognized that a creditor has a right to take reasonable measures to pursue his debtor and persuade payment, although the steps taken may result in some invasion of the debtor's privacy.

As was stated in *Gouldman-Taber Pontiac, Inc. v. Zerbst, supra,* "* * * When she accepts the credit, she impliedly consents for her creditor to take all reasonable and necessary action to collect a bill. * * *" *Id.* at 883. See also 14 A.L.R.2d 770, 138 A.L.R. 91, 55 A.L.R. 970.

A case where the actions of a creditor were held to be unreasonable was *Norris v. Moskin Stores, Inc.,* 272 Ala. 174, 132 So. 2d 321 (1961), where the alleged action of creditor's agent in making three telephone calls to members of the debtor's family, suggesting illicit relationship with the debtor without referring to the debt in a vicious attempt to coerce payment, constituted actionable invasion of the debtor's privacy. *Norris* also cites *Housh v. Peth,* 99 Ohio App. 485, 135 N.E.2d 440 (1955), affirmed 165 Ohio 35, 133 N.E.2d 340 (1956). There it was said that the action of the creditor was not reasonable where:

"* * * a creditor or his representative initiates a

campaign to harass and torment the debtor, telephones that debtor six or eight times every day at her home and place of employment—some of the calls as late as 11 :45 P.M.—over a period of three weeks, telephones the debtor's supervisors and informs them of the debt, and calls the debtor at her place of employment three times within a period of 15 minutes with a resultant threat of loss of employment." [Debtor was a school teacher.] *Id.* at 341.

See also *Guthridge v. Pen. Mod., Inc.*, 239 A. 2d 709 (Del. Super. Ct. 1967) ; *Carey v. Statewide Finance Co.*, 3 Conn. Cir. 716, 223 A. 2d 405 (1966) ; *Harms v. Miami Daily News*, 127 So. 2d 715 (Fla. Dist. Ct. App. 1961) ; *Biederman's of Springfield, Inc. v. Wright*, 322 S.W.2d 892 (Mo. 1959).

A review of the cases wherein recovery has been allowed, indicates that there is usually present a pattern of harassment on the part of the creditor, or the communication, if not of such frequency as to constitute harassment, has been of such a nature as to possess a vicious quality. In some cases there has been both a harassment as well as vicious language used in the communication. In *Housh v. Peth, supra,* there were telephone calls to the debtor six or eight times every day at her home, and upon one occasion three calls in 15 minutes to the debtor at her place of employment. Clearly, the defendant in *Housh* had embarked upon a planned campaign of harassment.

In *Harms v. Miami Daily News, Inc., supra,* a columnist included the following item in his column, "Wanna' hear a sexy telephone voice? Call——and ask for Louise." The telephone number given happened to be that of the business office of Louise's employer and the publication resulted in hundreds of unwanted telephone calls, not to mention the resulting embarrassment from the innuendo contained in the wording of the publication. Whether intentional or unintentional, the defendant's action not only resulted in harassment of the plaintiff but cast aspersions on her character.

In *Carey v. Statewide Finance Co., supra,* the court allowed recovery after numerous telephone calls both at home and to a hospital where the wife of the debtor was confined urging her

to have the husband pay the debt, again, we see that the creditor exceeded the bounds of reason.

In *Norris v. Moskin Stores, Inc., supra,* the creditor's agent called members of the debtor's family on three occasions and intimated that the debtor was having illicit relations with him. This is an example of where the quantity of the telephone calls was not unreasonable, but the content made the creditor's conduct actionable.

In the case at bar we do not think that five or six phone calls to the appellee, and two or three to her parents (who actually signed the note), over a period of eleven months, constituted a pattern of harassment.

According to the appellee's testimony, the language in the telephone calls, which otherwise may have been actionable, occurred in the calls made only to her, there being no publication to any third party. The objectionable language in these calls to her consisted of the comment "You can be put in jail for this"; and on another occasion, "We have a way of getting our money and it will ruin your reputation," and you "could lose your job." With regard to the first threat, it should be noted that the appellant did not actually state that he was going to put her in jail. Furthermore, had the appellee consulted any attorney she would have readily been advised there was no basis for such statement. Concerning the alleged threat "to ruin your reputation," it is obvious that the appellant was referring to her financial reputation as a credit risk and not her moral reputation. Regarding the statement that she "could lose her job," we again note that this was in the subjunctive; the employer knew of the debt and the appellee never lost her job.

In considering the impact of these statements, we must not overlook the fact that they were unaccompanied by any degree of persistency. The sporadic pattern of the calls over the 11 month period would seem to substantially mitigate any vicious quality attributable to the intent of the caller or the content of the calls. We are also impressed by the fact that these colloquyes occurred between the creditor and debtor and were not heard by any third party. Professor Prosser in his treatise, Prosser, *Torts* (3d Ed.), p. 835, § 112, states: "Some limits of this branch of the right of privacy appear to be fairly well marked out. The

disclosure of the private facts must be a public disclosure, and not a private one; there must be, in other words, publicity."

The problem of defining the scope or range within which the creditor might properly act in order to collect his debt, is the problem of balancing the interest of the creditor in collecting his debts against that of a debtor of ordinary sensibilities. Unless some latitude is given the creditor to invade, to a reasonable extent, the debtor's right of privacy, without incurring liability, we may well end up with the result that the creditor will find it preferable to proceed immediately with legal action when a debt becomes in default, without any warning to the debtor, rather than run the risk of being answerable to a supersensitive debtor in an action for invasion of privacy. See *Davis v. General Finance & Thrift Corp.,* 80 Ga. App. 708, 57 S.E.2d 225 (1950).

We do not believe the fact that the evidence finally proved the appellee not to be a maker on the note, which was the subject of collection, has any material bearing on the question of liability in this case. The appellee was of the firm conviction that she had obligated herself to pay for the automobile which she financed through the appellant and in fact, on the witness stand, affirmed this position until it was later shown that she had not signed the note but apparently had signed other papers at the office of the automobile dealer. Her parents were the makers of the note, but it was conceded by the appellee that this was done as a matter of accommodation and convenience to her, that she made all the payments on the note. It is clear that, but for the accident, she would undoubtedly have continued to liquidate the debt, recognizing it as an obligation.

In *Tollefson v. Safeway Stores,* 142 Colo. 442, 351 P. 2d 274 (1960), the Court stated, "* * * Even though we were to recognize the 'right of privacy' as applicable in this State, we are persuaded the facts of this case do not bring it within the doctrine. It is not an invasion of privacy to remind one of her obligations be they legal or moral." *Id.* at 276.

On the basis of the record before us and the law applicable to this kind of an invasion of privacy, we are of the opinion that the actions of the appellant were not such an intrusion of the appellee's right to be left alone, as to constitute a cause of ac-

544

tion. Accordingly, this is not a "proper case" for recovery and the judgment of the lower court is reversed.

*Judgment reversed, appellee to pay costs.*