# SUMMIT LOANS, INC. *v.* PECOLA

[No. 268, September Term, 1971.]

*Decided March 14, 1972.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Robert L. Kay,* with whom were *Harry Protas, Jordan M. Spivok* and *Protas, Kay & Spivok* on the brief, for appellant.

*John T. Bell,* with whom were *Charles W. Bell, Frank S. Cornelius* and *Bell & Bell* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The sole question presented to us in this appeal from a judgment entered by the Circuit Court for Montgomery County (Joseph M. Mathias, J.) in favor of the appellee, Barbara J. Pecola—who was plaintiff below—for $1,500.00 compensatory damages and $7,500.00 punitive damages against the appellant, Summit Loans, Inc., in an action in tort to recover damages for invasion of privacy, is whether the trial court erred in declining to direct the verdict in favor of Summit Loans because of alleged insufficiency of evidence submitted on behalf of Mrs. Pecola.

The parties do not disagree in regard to the applicable law which is now well established in Maryland. In *Carr v. Watkins,* 227 Md. 578, 177 A. 2d 841 (1962) Judge (now Chief Judge) Hammond, in a carefully considered opinion for the Court, reviewed the development of the law in regard to recovery of damages for the invasion of privacy and indicated that recovery of damages resulting from an invasion of privacy would, in a proper case, be allowed in this State. The Court cited with approval 1 *Harper and James, The Law of Torts,* §§ 9.5-9.7, at 677-91 (1956 ed.) ; *Prosser, Torts,* Ch. 20, at 635-44 (2nd ed. 1955) ; 4 *Restatement of Torts* § 867, at 398-402 (1939) ; Prosser, "Privacy," 48 Cal. L. Rev. 383, 386-89 (1960) ; and Warren and Brandeis, "The Right to Privacy," 4 Harv. L. Rev. 193 (1890), as well as a number of cases from other jurisdictions.

Judge Finan, for the Court, cited *Carr* with approval in *Household Finance Corp. v. Bridge,* 252 Md. 531, 250 A. 2d 878 (1969) and in the opinion provided an excellent analysis of the cases, law review articles and textbook comments in regard to oral invasion of privacy. The *Household Finance Corporation* case ultimately turned upon the sufficiency of evidence, the Court hold-

ing that five or six telephone calls to the plaintiff and two or three telephone calls to her parents over a period of 11 months, under the circumstances of that case, did not present sufficient evidence upon which the plaintiff could recover. We pointed out, however, that the two principal factors to be considered in determining the sufficiency of evidence to justify presentation of the case to a jury were:

1. The degree of persistency with which the oral invasion of privacy occurs.

2. The vicious quality of the oral invasion of privacy.

Judge Finan stated for the Court:

"The problem of defining the scope or range within which the creditor might properly act in order to collect his debt, is the problem of balancing the interest of the creditor in collecting his debts against that of a debtor of ordinary sensibilities. Unless some latitude is given the creditor to invade, to a reasonable extent, the debtor's right of privacy, without incurring liability, we may well end up with the result that the creditor will find it preferable to proceed immediately with legal action when a debt becomes in default, without any warning to the debtor, rather than run the risk of being answerable to a supersensitive debtor in an action for invasion of privacy. See *Davis v. General Finance & Thrift Corp.*, 80 Ga. App. 708, 57 S.E.2d 225 (1950)."

(252 Md. at 543, 250 A. 2d at 885-86.)

In our opinion, the trial court properly declined in the present case to direct a verdict in favor of Summit Loans in that there was sufficient evidence offered on behalf of the plaintiff, Mrs. Pecola, to justify a jury in concluding that Summit Loans had used vile, insulting and outrageous language in a large number of telephone

calls over a substantial period of time, indicating a deliberate and persistent course of improper conduct of such a nature as to support a verdict for punitive as well as for compensatory damages.

We now turn to a consideration of the facts, bearing in mind that in considering a ruling refusing to direct a verdict, the non-moving party is entitled to have us assume the truth of testimony offered on that party's behalf and resolve any conflicts in the testimony in favor of that party, giving that party the benefit of all reasonable inferences to be drawn from that testimony. *Katz v. Holsinger,* 264 Md. 307, 286 A. 2d 115 (1972).

Mrs. Pecola, testifying on her own behalf, stated that she was 36 years of age, married to Leonard Pecola and had three children. She was, at the time of trial, employed at the Randolph Nursing Home as a nurse's aide, but was not so employed in the fall and December of 1969. She was living at 4513 Mahan Road, Silver Spring, during the fall and winter of 1969, and had a telephone. Beginning the latter part of August, 1969, and continuing through January, 1970, representatives of Summit Loans made well over 200 telephone calls to her home. She identified the callers as Abraham Jacobs, a Mr. Wilson, a Mr. Gozzard and a Mr. Byers. There was an average of between 20 and 30 telephone calls a week. Pamela, Mrs. Pecola's daughter, then aged 11 years, answered the telephone most of the time. She remembered the first telephone call from Summit Loans by a man who gave his name as Mr. Jacobs at 2:30 P.M. on a day in late August, 1969, who asked Mrs. Pecola what in hell she was going to do about her husband's bill. Mrs. Pecola replied that she had no way to pay the bill, not being then employed, but Mr. Jacobs could call her husband where he worked, Summit Loans having his telephone number. After Mr. Jacobs hung up, a person who identified himself as Mr. Gozzard from Summit Loans immediately called up and told Mrs. Pecola that he was getting sick and fed up, something had to be done about the loan. When Mrs. Pecola said, "Please, I don't owe it,"

Mr. Gozzard stated, "I am going to tell you, you're common trash." Later, Summit Loans got her daughter Pamela on the telephone and "started harassing the child." The caller stated that he was Mr. Jacobs from Summit Loans. Summit Loans called the following morning at 9:00 A.M. and at 12:00 Noon. Sometimes they would call at 2:30 P.M. and at 5:30 P.M., but normally would not call when Mr. Pecola was at home and never on weekends. In September, 1969, a man identifying himself as Mr. Wilson from Summit Loans called and said, "You bitch, do you really love your children?" Mrs. Pecola said, "Yes, I love them." Mr. Wilson said, "How would you like for them not to come home? How would you not like to see your kids come home from school?" Mrs. Pecola hung up, after which Mr. Wilson immediately called back, laughed and said, "You know, you better check the schools." Mrs. Pecola proceeded to get the younger child and went down in the park to meet her other two children. She recalled a telephone call in the beginning of October by a person identifying himself as Mr. Jacobs of Summit Loans at 2:30 P.M., who stated, "Do you love your husband; how would you like not to see him come home?" When Mrs. Pecola said, "What do you mean?" he "just laughed and hung up." Later at 5:30 P.M., Mr. Jacobs called back and said, "Has he come home yet?" Mrs. Pecola said, "No," that being a day her husband was late in coming home. Mrs. Pecola became hysterical and could not finish preparing dinner. About three days later a call came in from Summit Loans—it sounded like Mr. Gozzard's voice—and it stated, "hey, we got him here; would you like to hear him cry, hear him cry in the background?" Mrs. Pecola hung up and called her husband at his work to see if he was all right. He said that he was and "what is wrong?" Mrs. Pecola then repeated what had been said.

As a result of the continued harassment, Mrs. Pecola became extremely nervous and depressed, sometimes regurgitating because of her upset condition. She consulted Dr. Raymond T. Benack who prescribed tranquilizers as

medication—one was Deprol and the other was Butazolidin—because she could not sleep at night. Mr. Gozzard from Summit Loans had called and stated, "Hey, you bitch, how would you like to get a phone call around three or four o'clock when you was sleeping real quietly?" She replied, "Please have mercy." Mr. Gozzard called Mrs. Pecola at 3:00 A.M. in the morning and said, "Hi, this is Summit." Mrs. Pecola hung up, and was immediately called back. She heard the same voice which began to laugh so that she hung up again. She was called back so that she took the receiver off of the telephone and put it under the sofa but could not eliminate the "buzzing noise that it makes."

Mr. Pecola in late August and September, 1969, was working for Universal Acceptance Corporation, an automobile financing company, and at one time had worked for Calvert Loan and Budget Finance. Mr. Pecola had signed notes involved in this case, but Mrs. Pecola had not signed them. The loan of Mr. Pecola was in default.

On cross-examination, Mrs. Pecola stated that she had a nervous breakdown in 1960 and had been hospitalized at Washington Sanitarium, Oakley Hall and Springfield. She had had seven miscarriages and later an operation which made her depressed. She had not, however, had to take tranquilizers until the harassment by Summit Loans began. She had been hospitalized in 1962, spending three weeks at Springfield, and again in 1964 at Springfield.

When asked why she never called the police, Mrs. Pecola stated that she did not know that she could do this.

At the time of trial on May 27, 1971, Mrs. Pecola was working as a nurse's aide earning $1.70 an hour. She had at one time worked at Zayres for $1.40 an hour.

Pamela Jean Pecola, 13 years of age at the time of trial, testified for the plaintiff, Mrs. Pecola, in regard to the telephone calls in the fall of 1969 and winter of 1970. There were "a lot of phone calls" from Summit Loans, by a man and never by a woman. She remembered one

of those telephone calls in September, 1969, when the family was visited by friends from Pennsylvania, Mr. and Mrs. Becker. Around 3:00 P.M., when Pamela returned home from school, Summit Loans called and asked to speak to Mrs. Pecola. When Pamela told them that her mother was talking to friends and could she call him back, "He got mad and he said, 'If you don't tell your mother who called, the big bad dragon is going to get you.'" The same person called again and said, "Sock it to you, sock it to you" and hung up. A week later the same person called and stated, "What is your mom doing; sitting in the green chair with a hole in it? You better tell your mother because the big fat dragon is going to get you" and hung up.

In a week, there were around 20 or 30 calls. In November, 1969, after her mother received a call, "she started crying and she couldn't fix dinner that night." This happened more than once. Right after Halloween, 1969, a man called from Summit Loans, with the same voice as she had heard in prior calls, and the following conversation took place:

> "He calls up and he goes, 'Is your mother there?' I said she was doing something; I can't remember. I go, 'Could she call you back?' He said, 'You know what your father is,' and I didn't understand him. He said, 'Your father is a common nigger,' and hung up. He called again and said my father was a bastard and then he hung up. He called back and said my mom is a low-down bitch, and hung up, and that's all."

There was another telephone conversation in November, 1969, during which some vile language was used.

Dr. Raymond T. Benack testified for the plaintiff that he was a duly licensed physician, aged 39, engaged in the private practice of medicine. He graduated from Georgetown Medical School in 1958 and did his internship and residency in internal medicine in St. Vincent's Hospital, Bridgeport. He treated Mrs. Pecola, beginning in ap-

proximately 1968, for hypoglycemia reaction, for meno-pausal symptoms and for migraine type variant head-aches with neurological changes occurring. In March, 1970, she was treated for nervousness and later developed an ulcer. In April, 1970, Mrs. Pecola and her husband came to see him and he "wanted to know what was go-ing on at that time." Dr. Benack was advised:

> "* * * she was under harassment by the loan company and I was told that she had received many calls at different times of the day and night, some of them using vulgar language, swearing, and apparently had also bothered her daughter."

Dr. Benack prescribed the use of Deprol, an antide-pressant drug. His bill for professional services was $355.00, a fair and reasonable bill. He testified without objection that he could state with reasonable medical certainty that the nervous symptoms and aggravation were "attributable to these phone calls."

The defendant, Summit Loans, introduced evidence indicating that it never made or authorized the telephone calls testified to by Mrs. Pecola and Pamela. Mr. Jacobs testified that he had never talked to Mrs. Pecola or her children on the telephone at any time, and that the com-pany's files did not indicate any such calls.

James Kenneth Sargent, 22 years of age, who was employed by Summit Loans during the period in ques-tion, testified that he had only one telephone conversa-tion. He did not recall speaking to any of the Pecola children. He admitted that he made some 100 telephone calls a day for Summit Loans and that he had "spoken to some families," and that he "was concerned" about Mr. Pecola's account being one month behind. He testified that the Summit Loans' card indicated that he had telephoned Mr. Pecola five times in October and made other calls to him in November, 1969.

Sargent also testified that the only instructions he had received from Summit Loans in regard to what to do

when he called a customer from the company's cards were "Just to contact the customer in reference to his payments" and to "Just write down whatever the customer tells me."

Summit Loans made a motion for a directed verdict at the end of the plaintiff's case and at the end of the entire case because of insufficiency of the evidence in that Mrs. Pecola's testimony was "almost unbelievable." Judge Mathias was of the opinion, however, that there was sufficient evidence to go to the jury, which was to determine the credibility of the witnesses. The trial court then instructed the jury that, in order to find for the plaintiff, they must find by a preponderance of the evidence unreasonable intrusion of the plaintiff's right of privacy. In regard to damages, the charge continued:

> "There are two kinds of damages that we are talking about in this case. The plaintiff asks you to award her compensatory damages which are damages calculated to make a person who has been injured whole again, or to reimburse the person for actual damages.
>
> "There is evidence in this case of a doctor's bill. The doctor testified that his bill for treating this patient for nervousness, he claimed, was caused by these telephone calls. He told you what the amount of his bill was.
>
> "There is also in this case what we call a claim for punitive damages. Punitive damages cannot be awarded unless you should find there are actual damages. You cannot award punitive damages without also awarding actual damages. There must be actual damages to support an award of punitive damages.
>
> "Punitive damages may be awarded in a proper case to punish the defendant for what you regard, if you should regard it so, as outrageous conduct on his part. In other words, punitive damages are awarded to punish and

they are also awarded for the purpose of determing or warning others or giving examples to others and to the defendant so that this wrong will not be committed again. Whether or not to award punitive damages is entirely in the discretion of the jury. To entitle one to punitive damages, there must be an element of fraud or malice or evil intent or oppression entering into and forming a part of the wrongful act."

There were no exceptions taken by either side to the charge.

In our opinion, there was sufficient evidence in the case, if the jury believed the testimony of Mrs. Pecola and of Pamela—as it obviously did—to require that the case be submitted to the jury on the issue of an unreasonable invasion of Mrs. Pecola's privacy. Their testimony, already stated, indicates both a persistent and deliberate policy by Summit Loans to harass Mrs. Pecola and further to use vicious and vile language to coerce and intimidate her. There was, in our opinion, sufficient evidence of outrageous conduct on the part of Summit Loans with elements of malice, evil intent and oppression to support the jury's award of punitive damages, it having found a verdict for compensatory damages in favor of Mrs. Pecola.

*Judgment affirmed, the appellant to pay the costs.*