558 P.2d 954

**SEARS, ROEBUCK AND CO., a corporation, Appellant,**

v.

**James M. MOTEN and Dianne Moten, husband and wife, Appellees.**

**No. 2 CA–CIV 2179.**

Court of Appeals of Arizona, Division 2.

Oct. 29, 1976.

Rehearing Denied Nov. 30, 1976.

Petition for Review Denied Jan. 18, 1977.

Merchant, Lohse & Bloom by Cliffton E. Bloom, Arthur L. Hirsch, Tucson, for appellant.

Albert R. Gamble, Tucson, for appellees.

## OPINION

HOWARD, Chief Judge.

Appellant filed a complaint in superior court against appellees alleging that they were indebted to it in the sum of $789.96. Appellees answered and counterclaimed in two counts. The case went to trial before a jury. The court directed a verdict in favor of the appellees on appellant's complaint, directed a verdict in favor of appellant on Count One of appellees' counterclaim and the matter was submitted to the jury on Count Two of the counterclaim. The jury awarded appellees the sum of $1 for compensatory damages and $1 for punitive

damages. Appellees then moved for an additur or in the alternative for a new trial. The court granted an additur in the sum of $25,000 compensatory damages and $5,000 punitive damages. Appellant now questions the propriety of the trial court's action.

In the spring of 1972, after unsuccessful efforts to collect from Sgt. Moten and after his return to the continental United States, appellant (hereinafter Sears) sent a form letter to Col. Doughty, Moten's commanding officer at Davis-Monthan Air Force Base which stated that Moten was indebted to Sears and that he refused to pay this indebtedness.

Col. Doughty counseled Sgt. Moten on the Sears and other debts and even devised a plan for him as to payment of the outstanding debts. Specifically referring to the Sears' indebtedness, Col. Doughty testified that he received many different stories from Moten on this indebtedness. At one time he admitted he owed the money. At another time he denied owing the money and at a different time he said that he and Sears had made arrangements for payment of the account. Col. Doughty suggested that Moten contact Sears and might have at one point told Moten to contact Sears while Moten was in the colonel's office.

When Moten failed to make any arrangements with Sears a representative of Sears called Col. Doughty on the telephone. Doughty explained the position of the Air Force at that time and sent Sears a letter which in essence was what he had already told the representative. This letter stated the Air Force had no authority to arbitrate, intervene in, or enforce settlement of matters of this type; that they were not a collection agency; and that it was a matter of civil nature for resolution in the civil courts. The letter did state that the Air Force might take action in cases of continuous financial irresponsibility, in order to improve discipline and to maintain the standards of conduct expected of Air Force personnel but that such action could not be used to enforce private civil obligations.

When Col. Doughty received a letter from American Express Company concerning Moten's indebtedness to it, he sent Sgt. Moten a document which informed him of his intention to place the Sears letter in an unfavorable information file. This unfavorable information file is maintained in conjunction with an airman's personal records.

On May 1, 1972, Col. Doughty counseled Sgt. Moten regarding his financial responsibilities and indebtedness which included a motel bill in Iceland, the American Express Company indebtedness and the Sears debt. Col. Doughty had been advised, prior to the meeting, that a representative of Sears had been to Moten's house in an effort to collect the Sears obligation and that Moten's wife had shot at the bill collector. This information came to Col. Doughty's attention from the base security police who had been informed of the incident by a phone call from Sears credit department. The telephonic communication to base security, indicated that there was an outstanding balance on the account, that Sears had written to Moten several times and attempted to contact him by phone on a number of occasions and was receiving no assistance in this matter from the military (this telephone call was prior to the time Col. Doughty sent his letter to Sears). In this telephone communication Sears told base security that on two occasions members of its collection staff had visited Moten's home in an attempt to obtain some type of settlement or work out arrangements for payment. It indicated that on these occasions Sears employees had been threatened with a gun, the inference being that Moten was the individual who had threatened them. All this information on the telephone conversation was related to Col. Doughty in the form of a letter.

In the interview of May 1, 1972, Moten requested a transfer but Col. Doughty explained that the wing commander had already stated that he could not be transferred because of a shortage in the wing of Moten's particular speciality.

Two days later, on May 3, 1972, Col. Doughty determined that the information on the Sears and American Express indebtedness should be placed in Moten's unfavorable information file.

On May 4, 1972, at Moten's request, Col. Doughty discussed his financial problems with him and in particular the Sears Roebuck incident and his intentions. On the same date a Mr. Rotchstein from Sears telephoned Col. Doughty. Col. Doughty explained he had counseled Sgt. Moten regarding his obligations. He also pointed out to Mr. Rotchstein that Sgt. Moten had come to him that day and said he would be willing to try to make some arrangements to take care of the debt. Mr. Rotchstein then asked the Colonel to advise Sgt. Moten that he should see him before Saturday with a partial payment and they would do everything possible to work out a payment plan within his means. Mr. Rotchstein also asked the Colonel to tell Sgt. Moten that if he failed to appear by Saturday, Sears would be forced to start legal action. During this conversation it came to light that an insurance policy, which Sgt. Moten and told the Colonel was going to pay off the indebtedness, was only a maintenance service policy and not insurance against theft or damage. The Colonel talked with Sgt. Moten and relayed to him Mr. Rotchstein's message. Sgt. Moten told the Colonel that he would contact Sears. He did not do so and on June 8, 1972 suit was filed.

On June 30, 1972, because of the letters from Sears and the American Express Company, Col. Doughty denied Sgt. Moten the Air Force Good Conduct Medal. After the suit was filed Col. Doughty recommended that Moten's promotion to Sgt. E-5 be withdrawn because of financial irresponsibility. On August 1, 1972, Col. Doughty called Sgt. Moten and informed him that the Strategic Air Command Inspector General and the wing inspector had overruled his decision regarding his promotion to E-5 and therefore Moten would be promoted on that day along with the others who had been recommended for promotion. The Colonel also informed Moten that the SAC inspector had

advised him that the unfavorable information file had to be withdrawn. A letter on August 7, 1972 to Col. Doughty confirmed the information which Col. Doughty communicated to Moten and stated that the unfavorable information file should be withdrawn. (This means that the matter contained therein is to be destroyed.)

On August 10, 1972, Sgt. Moten received a bad efficiency report from the non-commissioned officer in charge of the maintenance branch of the 390th Missile Maintenance Squadron. This report was concurred in by Col. Doughty who stated:

"Staff Sergeant Moten has, at times, demonstrated the potential of doing a much better job than he has been producing. A positive attitude and more initiative on his part would greatly increase the professionalism and quantity of his duty performance. He carries tasks to completion, but only after receiving detailed and sometimes repeated instructions."

On April 1, 1973, Sgt. Moten was elevated to the position of chief clerk for the 390th Missile Maintenance Squadron.

An efficiency report covering the period of March 1, 1973, to February 29, 1974, was made by the First Sgt. of the 390th Missile Maintenance Squadron and endorsed by its then commander, Col. James F. Brolin. This efficiency report, which can be characterized as bordering on excellent to outstanding, states:

"Sgt. Moten has implemented aggressive programs which have enhanced unit administration. Continued improvement with respect to unilateral acceptance of responsibility and diplomacy under conditions of extreme stress will enable Sergeant Moten to be an outstanding NCO and administrative supervisor."

On January 11, 1974, Sgt. Moten made a special duty application requesting assignment as an administrative supervisor. This would have required a transfer from his current unit. Sgt. Moten stated in the request that he was due for re-enlistment soon and would definitely re-enlist if his application received favorable considera-

tion. Lt.Col. Brazill, deputy commander of the Squadron recommended favorable action on the application, however, the Air Force denied the special duty application.

Col. Brazill, who had been deputy commander under Col. Doughty, tried to talk Sgt. Moten into re-enlisting. Sgt. Moten said he would not re-enlist because he had bigger and better things to do. At no time did Sgt. Moten ever tell Col. Brazill that he was not re-enlisting because of the Sears incident.

Col. Brazill was of the opinion that there was a personality clash between Col. Doughty and Sgt. Moten. Col. Brazill also testified that he was unaware of any debt owed to Sears Roebuck.

At trial Moten testified that he did not re-enlist because he felt that he had no future in the Air Force and never would be transferred to a higher position because of the Sears incident. He also testified that he was put on a demeaning work detail as a result of Sears' action. He felt that each new commander would be briefed about him and would know about the incident. He further testified he was working on a job concerned with a re-entry vehicle, but that after Col. Doughty received the information from base security he was "declassified" and placed in another job for being humanly unreliable. He admitted that he owed Sears approximately $500; that he did not lose any pay or any promotions and in his deposition taken before trial stated that he was put on the work detail because he had asked for emergency leave.

Appellant does not challenge on appeal the directed verdict against it on the debt, although it appears from the entire record that the court was in error in granting this directed verdict.[1] Nor does appellant claim that the court erred in failing to direct a verdict in its favor on James Moten's counterclaim. With this in mind we direct ourselves to the appellees' theory at trial which was that Sears through defamation and coercive means of collection, harassed Moten

out of the Air Force. They claimed $30,000 actual damages and $1,000,000 punitive damages. Appellant contends that the jury award of $1 compensatory damages and $1 punitive damages was justified by the evidence and the court erred in granting an additur.

It is generally recognized that a creditor has a right to take reasonable measures to pursue his debtor and persuade payment, although the steps taken may result in some invasion of the debtor's privacy. *Household Finance Corporation v. Bridge*, 252 Md. 531, 250 A.2d 878 (1969). When a person accepts credit he impliedly consents for his creditor to take all reasonable and necessary action to collect the bill. *Gouldman Taber Pontiac, Inc. v. Zerbst*, 213 Ga. 682, 100 S.E.2d 881 (1957).

A creditor does not incur liability for invasion of privacy by contacting the person's employer in an effort to collect. *Patton v. Jacobs*, 118 Ind.App. 358, 78 N.E.2d 789 (1948). An employee has no right of privacy as against his employer in the matter of a debt he owes and a creditor who gives such information to the employer, unaccompanied by slanderous, libelous, defamatory or coercive conduct, incurs no liability in so doing. *Household Finance Corporation v. Bridge*, supra. We do not perceive the rule to be any different when the employer is the United States. See *Patton v. Jacobs*, supra. Nor do we perceive the rule to be different when the employer is not only the United States but a branch of its armed forces. To hold otherwise, on the basis that the creditor knows or should know that if the debtor does not make satisfactory arrangements to pay the debt, the matter might end up in an unfavorable information file, or adversely affect the serviceman in his opportunities for promotion, would effectively prevent creditors from trying to make an amicable settlement of a debt prior to filing a lawsuit. That the relationship between the serviceman and the community is of vital importance to all military commanders is evi-

---

1. The parties stipulated in the pretrial memorandum that James Moten did owe Sears some amount and the only issue was whether or not he had received proper credit.

denced by the fact that the Uniform Code of Military Justice, manual for courts-martial, United States, (1969 Rev.Ed.), p. 28–77 makes it a court-martial offense under 10 U.S.C. § 934[2] to dishonorably fail to pay just debts under circumstances which bring or tend to bring discredit upon the armed forces or which are prejudicial to good order and discipline of the armed forces. Furthermore, we note that the military and security considerations make it vital for the commander to know if members of his unit are having financial difficulties.

■ The evidence here shows a letter to the company commander from Sears and two telephone conversations with Sears. The telephone call to base security from Sears apparently related to the incident involving Mrs. Moten. The letter from base security to Col. Doughty stated that on two occasions members of Sears' collection staff had been threatened with a rifle. In was inferred to base security that it was Sgt. Moten who had done the threatening. This would be an accusation of Sgt. Moten of assault with a deadly weapon, which, being an allegation of a crime involving moral turpitude, is slanderous per se. See *Modla v. Parker,* 17 Ariz.App. 54, 495 P.2d 494 (1972). It is clear from the evidence that Col. Doughty considered the letter from base security to be a reference only to the alleged assault by Mrs. Moten. The memo written by Col. Doughty on the date of the incident states:

"I advised Sergeant Moten that CM Sgt. Janak, Security Police, had provided me a letter which reflected Mr. Allair of Sears' Credit Department request for assistance. I also pointed out that his apparent hope to gain partial relief through denying that it was he who threatened the bill collector with a gun (it was in fact Mrs. Moten) could only be considered as a shady tactic and had little chance of affecting the primary issue, the debt."

■ The allegation that Sgt. Moten had committed the assault was the only statement made by Sears in which there was a

factual dispute as to truthfulness, truthfulness being a defense, *McClinton v. Rice,* 76 Ariz. 358, 265 P.2d 425 (1953). Everything else communicated to Col. Doughty was in fact true. The communication by Sears to base security was for the purpose of ascertaining the chain of command in an attempt to settle the account and not for the purpose of criminal prosecution, therefore was not privileged. See, 53 C.J.S. Libel and Slander § 114 and § 104d(9).

The charge that Sgt. Moten had assaulted Sears' representative with a deadly weapon was known only to members of base security and Col. Doughty took it as a fact that the assault was committed by Mrs. Moten and not Sgt. Moten. What damages did James Moten suffer as a result of this alleged defamation?

■ As for the other conduct of Sears in contacting Col. Doughty, assuming, but not deciding, that reasonable jurors could disagree as to its propriety, there was a jury question as to whether the conduct was reasonable. The jury's verdict reflects a finding that such conduct was either reasonable or that Moten did not sustain his burden of proving he was damaged by the conduct and further reflects the conclusion that only nominal damages be awarded on the defamation claim. In *Creamer v. Troiano,* 108 Ariz. 573, 503 P.2d 794 (1972) the Supreme Court in reversing an order granting an additur stated:

"Almost always when there is a conflict in the evidence, the trial judge should not interfere with what is peculiarly the jury's function, and if he does not, we will nearly always uphold him. If there is no conflict in the evidence on items that obviously were omitted from the verdict, the trial judge must adjust, and we will uphold him if he does. Behind all of these tests still stands the original doctrine—that if the verdict is supported by adequate evidence, it will not be disturbed, and the greatest possible discretion is in the hands of the trial judge. In this court, the ultimate test will always

---

2. On the constitutionality of Article 134, Uniform Code of Military Justice, 10 U.S.C. Sec. 934, see *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).

be justice,' and any case before us which shows an unjust result because of the granting or denial of either additur or remittitur, will be reversed. Each case will be considered upon its own facts." 108 Ariz. at 576–577, 503 P.2d at 797.

▪ Applying the foregoing test the granting of an additur in this case creates an unjust result. The granting of nominal damages by the jury in this case was entirely justified by the evidence.

The order of the trial court granting an additur or in the alternative a new trial is vacated. The cause is remanded with directions to enter judgment in favor of appellees in accordance with the jury verdict.

KRUCKER and HATHAWAY, JJ., concur.