BEANE ET UX. *v.* McMULLEN ET AL.

[No. 323, September Term, 1971.]

*Decided May 18, 1972.*

*Motion for rehearing filed June 9, 1972; denied June 28, 1972.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN,█ SINGLEY, SMITH and DIGGES, JJ.

*Henry F. Leonning* for appellants.

*Kenneth E. Pruden* for Stephen McMullen et ux., part of appellees.

*Glenn B. Harten, Associate County Attorney,* with whom were *Walter H. Maloney, County Attorney,* and *Dennis A. Laskin, Associate County Attorney,* on the brief, for Prince George's County, other appellee.

BARNES, J., delivered the opinion of the Court.

Five principal questions are presented by the appellants, Eugene C. Beane, Sr. and Mary Beane, his wife, plaintiffs below, to us for decision, *i.e.,* whether the Circuit Court for Prince George's County (Robert B. Mathias, J.) erred in granting the motion of Stephen McMullen and Virgie McMullen, his wife, two of the appellees and two of the defendants in the lower court, for a directed verdict in their favor at the end of the case in regard to the claims of the plaintiffs for (1) an alleged invasion of privacy, (2) interference with the pursuit of business by the plaintiff, Eugene C. Beane, Sr., (3) the slander of the plaintiffs' title by the McMullens, (4) the dismissal of the counterclaim of the Beanes to the McMullens' counterclaim in regard to water damage and (5) the sufficiency of the injunctive relief granted the Beanes in regard to water damage caused by the Board of County Commissioners for Prince George's County, the remaining appellee and a cross-defendant below. We have concluded that there was no error in the lower court's rulings in regard to the first four questions but that there was error in its ruling in regard to injunctive relief.

The Beanes and the McMullens own adjacent property in the Melwood Election District in Prince George's County partly on the Ritchie-Marlboro Road not far from Upper Marlboro. They acquired their respective properties in 1956 from a common owner. The adjoining line of each property is substantially identical, being the second call in each deed. The call in the McMullen deed is "to an iron peg, thence on center line of Old Forestville-Oak Grove Public Road (2) S 66° 45' E 763.62 Ft. to an iron peg." The second call in the Beane deed is "to

an iron peg, thence with Stephen McMullen's 4.14 acre parcel, thence (2) South 66° 45′ East 763.2 feet to an iron peg. . . ." A survey of B. J. Dirks, referred to in both deeds and attached to the Beane deed, shows the adjoining line as the center line of the Old Forestville-Oak Grove Public Road and as being a straight line. The testimony, however, indicated that the roadbed curved. This old roadbed has been closed and unused for approximately 30 to 35 years.

The Beanes first moved to their property in 1956 between Christmas and New Year. The McMullens moved to their property somewhat later. There was a friendly relationship between the neighbors initially. Mr. Beane, in return for a promise given by Mr. McMullen to supply water for rabbits raised by Mr. Beane and sold for experimental purposes, assisted Mr. McMullen to locate and construct a well for a spring on the McMullen land which was making that land swampy. He also assisted Mr. McMullen in lowering a pipe under what is presently known as Bauman Road. A water pump was installed and a substantial water supply resulted, used by Mr. McMullen for azaleas raised and sold by him, and by Mr. Beane for his 250 rabbits.

Later, Mr. McMullen desired to build a dwelling house on his land and requested that Mr. Beane convey to him a portion of his frontage inasmuch as McMullen was having difficulty in obtaining a mortgage through the bank with only 40 feet of frontage. Mr. Beane indicated his willingness to do this if the consent of his mortgagee to the proposed arrangement could be obtained. The mortgagee was agreeable to the proposal provided there was an equal exchange of back land by the McMullens to make the Beane land more regular in shape. When Beane told McMullen what the mortgagee said, McMullen, in an hour's time, cut off Beane's water supply so that there was no water for the rabbits. After this episode, there were no friendly relations between the Beanes and the McMullens.

Mr. Beane had been in the fuel oil business for some 35 years. In the fall of 1958, he began to work for the Temple Hills Oil Company. He worked for this company until 1964 when he went into the fuel oil business for himself.

On April 24, 1961, the Zoning Ordinance for Prince George's County became effective for most of the County. The Beanes and McMullen properties were placed in the R-R zone (Rural Residential). A nursery business was allowed in the R-R zone and there were provisions permitting the continuance of nonconforming uses to which reference will be made later.

According to Beane, Mrs. McMullen began making complaints to county officials in 1965 concerning his parking of oil trucks and dumping fill. He estimated that there had been 50 investigations since that time but he gave no details concerning them except in regard to the following specific complaints.

Mrs. McMullen, in a letter dated "April 1969" addressed to the County Commissioners of Prince George's County, stated that she had a problem to which she had been trying to find a solution, *i.e.,* in regard to the situation on the neighboring Beane property. She stated that Mr. Beane had put a discarded water heater, an old washing machine and other debris on his lot which caused the water to stand in a stagnant form with green mold. She had communicated with the Public Works Department (Mr. Marburger's office) and was promised that there would be an inspection but none had occurred. She also stated that there was an unfinished house on the Beane property, that the property was used for business although never posted or zoned for business use, and further that she understood that occupancy permits for one-family use under the zoning law would be soon required after inspection—a procedure which she approved "100%." She hoped the County would "look into the matter and help me clear up my problem."

On May 13, 1969, Mr. McMullen wrote to the County

Commissioners, complaining about the depositing of debris on the Beane property and stagnant water. He expressed the hope that the County would send someone out to "view this problem" inasmuch as it is difficult to visualize the situation without personal inspection.

The County Commissioners wrote to Mrs. McMullen in June 1969, advising that the Department of. Public Works and the Bureau of Urban Services had inspected and were inspecting the Beane property. Mrs. McMullen, on September 30, 1969, not having been advised in regard to the results of the investigations, wrote to the County Commissioners, indicating that although she was grateful that the investigation had been made, she thought that three months was sufficient time within which to complete it and she hoped that the problem could be solved "before the winter snows * * * add to the condition."

On October 7, 1969, an inter-office memorandum of the County indicates that as a result of the letter of September 30, 1969, Mr. Jones and Mr. Sabona, Refuse Collections Supervisor of the Department of Public Works, had "re-investigated this situation in the field on Friday, October 3, 1969." [1] The memorandum then continued in part:

> "This inspection confirmed that there was indeed some bulky items of refuse located in the drainage ditch on Mr. Beane's property as shown on the enclosed sketch. This trash consists of one washing machine, two hot water tanks, one car seat, one stove and some miscellaneous wood. The items are located at the toe of the

---

1. Mr. Sabona testified that he had originally investigated the McMullen complaint in May, 1969, at which time he saw "a ditch" some 20 feet wide in which an old washing machine had been thrown. He came back later, talked to Mr. Beane and was told by him that some person unknown had thrown the debris on the property, "he was getting sick and tired of being harassed and he wasn't going to move nothing," but if the County wished to move it, it would be all right with him. The washing machine could not be seen from the McMullen home because of the brush and trees then there.

drainage channel which is approximately 25′ deep. These items are not blocking the natural drainage or the flow of water contributed by the County storm drainage system from Sansbury Road. Obviously, they should be removed. However, to do so by the home owner would cost a considerable amount of money since a crane is needed to lift the items to road bed or truck height.

"Mr. Beane indicated that he would prefer to fill the drainage channel, thereby covering the discarded items which, of course, would not only be cheaper but improve his property. Such action would block the flow of storm water and require the County to expend a large sum of money to extend the storm drain system from Sansbury Road along Ritchie-Marlboro Road. * * *"

Apparently as a result of the McMullen complaint of November 13, 1969, the Maryland-National Capital Park and Planning Commission considered the zoning situation at the Beane property. It ruled that Beane was in violation of the zoning ordinance in using the property for commercial purposes, in having fuel oil tanks and in parking fuel oil trucks on the Beane property. Beane appealed the decision to the Board of Appeals for Prince George's County. On January 27, 1970, that Board affirmed the Park and Planning Commission in regard to keeping the oil tanks on the property but reversed it in regard to the parking of oil trucks, finding from the evidence that Beane had established a valid nonconforming use for parking the trucks.

In March 1970 Mrs. McMullen wrote a letter to Congressman Lawrence J. Hogan, reviewing the prior efforts to obtain action by the County, without much success (according to Mrs. McMullen), stating the water problem and the presence of 3 families on the Beane property. She requested Congressman Hogan (for whom Mrs.

McMullen stated she had voted) to help solve her problem.

Congressman Hogan promptly wrote to the County's Supervisor of Zoning on March 4, 1970. He reviewed the McMullen complaints and inquired whether (1) a person could operate an oil business in the area, (2) could three families live in the Beane dwelling, and (3) could the owner of the Beane property be made to complete the house?

After investigations by the Housing Coordinator and possibly others, the Chief Zoning Inspector replied to Congressman Hogan, on March 18, 1970, in part, as follows:

"In response to Mr. McMullen's complaint to this office on September 30, 1969, we directed Mr. Eugene Beane, owner of the subject property to apply for a use and occupancy permit for his oil delivery business. Since the property is zoned residential, Mr. Beane was required to present proof that his use of the premises is 'legal non-conforming', i.e., that the use began prior to the zoning of the area.

"In a public hearing before the Board of Zoning Appeals on January 12, 1970, Mr. Beane established his right to use the west side of his property for the parking of fuel oil trucks as he had done for many years. Since the hearing, Mr. Beane has done much to improve the appearance of the premises, and eliminated the unauthorized storage of tanks.

"With regard to the residence, a housing inspector has reported no violations of the housing code. The residents on the property are blood relatives. While a wing of the structure is not yet completed, no violation of the building code was noted by a building inspector on the site.

"Mr. Beane interrupted the expansion of the dwelling when he learned that the State Roads

Commission plans to condemn a portion of his property. Until that matter is resolved, the Chief Building Inspector will request Mr. Beane to improve the appearance of the exterior. It is emphasized, however, that no code violations exist.

"While this report may provide little satisfaction for Mr. McMullen, I am sure you appreciate that the rights of Mr. Beane, too, must be protected."

There was another complaint by the McMullens to the County, dated April 13, 1970. On April 21, 1970, the Assistant to the Administrative Officer of the County wrote to the Director of Inspections and Permits, as follows "Re: McMullen Complaint":

"Sounds like the Hattfields and the McCoys! Don't mean to put you in the middle, but please furnish Mr. McMullen with a direct reply summarizing action taken to date and current status. Has Mr. Beane cooperated? Was a follow-up inspection conducted? Is he now in compliance? etc.

"It appears that Mr. Beane may be filling in the drainage channel as forecast in Nick Stoliaroff's memo of October 7th (attached). Is this legal? Will it involve county extension of the storm drain system as predicted by Nick?

"Please provide me with a copy of your reply. I have told Mrs. McMullen that she will be hearing from you around the first week of May."

The Director of Inspections and Permits wrote to Mrs. McMullen on May 1, 1970, in part, as follows:

"As you know, the Board of Zoning Appeals has determined after a public hearing that Mr. Beane has a right to use his property for parking oil trucks. Regardless of who owned the trucks which were parked there before the zon-

ing was established, the continued use of the property is legal non-conforming.

"With regard to your complaint of recent dumping of rubble in a manner to obstruct drainage along Fernwood Drive, I am forwarding a copy of your letter to the Director of Public Works. I am sure that he will take appropriate steps to have the drainage restored if it has been unlawfully obstructed."

The Beanes filed their declaration in the present case on June 2, 1970. It consists of three tort counts. Count I seeks recovery of damages for alleged violations of the Beanes' right to privacy by defendants, "by making extreme, excessive, vigorous and unjustified complaints to the various persons and the public authorities that the Plaintiffs' home was occupied by three (3) families in violation of the law, that the Plaintiffs did not have a building permit for a porch improvement and that trash was being dumped on the Plaintiffs' property illegally when the Defendants knew or should have known that said complaints were unjustified." These complaints, it was averred, were made with "the intent to harass and vexed [sic] the Plaintiffs and invade, adversely affect and destroy the Plaintiffs' right to privacy." It was further averred that the complaints were made "with the intent that the public authorities would investigate said complaints which said authorities did causing the Plaintiffs the loss of their privacy, harassment and undue notoriety as the Defendants well knew or should have known * * *." $5,000.00 in actual damages are claimed together with "such exemplary damages as may be just under the circumstances * * *."

Count II claims $5,000.00 actual damages and such punitive damages as may be just for alleged unlawful interference with Mr. Beane's business. It avers that the McMullens did "willfully, wantonly, maliciously and without cause or justification" interfere with Mr. Beane's lawful fuel oil distribution business "by complaining to

the public authorities of Prince George's County, Mary-land, that said business was not properly zoned and by giving misleading statements to said authorities" concerning Mr. Beane's operation of the business as a nonconforming use.

Count III sounds in slander of title and avers that Mrs. McMullen "did maliciously, willfully and wrongfully claim title to the Plaintiffs' land well knowing the same not to be hers and did then and there give permission to install drainage pipe thereon to the public authorities of Prince George's County" with the intent that those authorities would install drainage thereon, which they did, "thereby destroying the value of the Plaintiffs' property, causing drainage to be dumped thereon and stagnate and the loss of use of the Plaintiffs' land." $25,000.00 in damages was claimed and such exemplary damages as might be just.

The general ad damnum clause claims $100,000.00 "in total damages both actual and exemplary and costs of this suit." A jury trial was elected.

After a demurrer to the declaration was overruled, the McMullens, on September 1, 1970, pleaded the general issue pleas in tort and, on the same day, filed a counterclaim declaration containing two counts. Count I alleged that the Beanes deposited trash, debris, dirt, sand, loam and other materials on their land which interrupted the natural flow of surface water which caused the inundation of a part of the McMullen property. For the damages resulting from this, the McMullens claimed $25,000.00 compensatory damages and $50,000.00 punitive damages.

Count II incorporated by reference the averments of Count I and claimed that the conduct of the Beanes created a nuisance causing stagnant water to accumulate—a breeding place for mosquitoes as well as causing noxious odors, the damages from which were claimed to be $25,000.00 compensatory damages and $50,000.00 punitive damages.

The Beanes filed the general issue plea, *i.e.*, that they did not commit the wrongs alleged and an additional plea, that the alleged causes of action "did not accrue within three years of the filing thereof."

The Beanes thereafter filed a motion to join the Board of County Commissioners of Prince George's County (County Commissioners) as an additional party defendant in view of the filing of the McMullen counterclaim. This motion was granted by the lower court.

On October 2, 1970, the Beanes filed a counterclaim against the McMullens and the County Commissioners, averring that the County Commissioners and their agents, servants and employees with the help and assistance of the McMullens did "unlawfully, willfully and wrongfully and without just excuse collect various surface waters" which did not naturally flow onto and upon the Beane property into a man-made drainage ditch and pipe, casting the water upon the Beane land, causing great damage and loss of use of the Beane property. The damage claim was for $100,000.00 actual damages and $50,000.00 punitive damages. It was also prayed that an injunction issue against the County Commissioners enjoining the County "from further allowing unnatural surface water to flow on the lands of the Plaintiffs." A jury trial was elected for the trial of the counterclaim.

The County Commissioners filed the general issue plea —that it did not commit the wrong alleged—on February 16, 1971.

The case came on for trial before Judge Mathias and a jury on July 12, 1971. In addition to the facts already given, Mr. Beane testified that, as a result of the worry resulting from the complaints of the McMullens, he suffered a heart attack on July 1, 1969, and was in the hospital some 24 days. He had a second heart attack on August 1, 1970, allegedly resulting from the same cause. He testified there was very little natural drainage of water that did not soak into the ground prior to the placing of the pipe by the County. Since then, the water

continues to run for hours after a storm, collects in the roadbed and stays for weeks at a time. "It stagnated. It stunk." Since the County directed the water from Sansbury Road to his property, he has "hundreds of thousands of gallons [of water] more when it rains." He has been filling the area in question with dirt with some cement mixed in it, but no trash. Beane also stated that he had two oil trucks and a "stake body" he had purchased new. He had erected a fruit stand on his property "this spring" having received a permit to buy and sell produce.

Mr. Beane's son, Elwood, testified in regard to a complaint made by the McMullens beginning in 1965 to the county officials. He stated that there had been "no less than 25 or 30 inspections of that ditch or road bed, fill site." Various photographs of the site were introduced into evidence. He had "griped about that pipe to nearly every county official that ever came there regardless of what initiated his visit."

Additional facts will be given when the questions presented for decision are later discussed.

At the conclusion of the testimony, after an elaborate oral review of the testimony and exhibits, with certain findings of fact, the lower court directed the verdict in favor of the McMullens on all three counts of the original declaration. The trial judge also directed a verdict for the McMullens on the Beanes' counterclaim. The counterclaim of the McMullens against the Beanes (Counterclaim #1) and the counterclaim of the Beanes against the County Commissioners (Counterclaim #2) were submitted to the jury which found a verdict in favor of the Beanes on Counterclaim #1 and in favor of the Beanes against the County Commissioners for $2,000.00 on Counterclaim #2.

After the verdict, the lower court considered the matter of injunctive relief in chambers and orally decided initially to deny that relief. Later, the lower court, on its own motion, decided to have a further hearing in regard to injunctive relief because of a lack of a survey

and topographical study of the land below the drainage pipe in question. The Beanes objected to this procedure, relying upon the finality of the verdict of the jury on the question of liability of the County and the consequent need for injunctive relief, and further because of the lack of any motion by any of the parties for the taking of additional testimony on the merits.

At the further hearing a plat prepared for the Washington Suburban Sanitary Commission by an unidentified firm was offered in evidence by the County Commissioners; and its admission into evidence was strenuously objected to by counsel for the Beanes. It was, however, received into evidence and the lower court construed it to contain facts contrary to the facts upon which the jury based its verdict. The lower court declined to grant the full injunctive relief prayed for by the Beanes, but did require the County Commissioners to remove so much of the offending pipe as was on the Beane property. The Beanes filed timely appeals from all adverse rulings. No cross-appeal was filed by the County Commissioners.

1. *Invasion of privacy.*

The parties do not differ in regard to the law applicable to an alleged invasion of privacy, recognizing that the tort is now well established in Maryland. We observed in the recent case of *Summit Loans, Inc. v. Pecola,* 265 Md. 43, 288 A. 2d 114 (decided March 14, 1972) that Judge (now Chief Judge) Hammond, in a carefully considered opinion for the Court, in *Carr v. Watkins,* 227 Md. 578, 177 A. 2d 841 (1962), had reviewed the development of the law in regard to this tort and that, in a proper case, damages could be recovered in Maryland resulting from an invasion of privacy. We noted also in *Summit Loans* that Judge Finan, for the Court, in *Household Finance Corp. v. Bridge,* 252 Md. 531, 250 A. 2d 878 (1969) had cited *Carr* with approval and in that opinion had provided an excellent analysis of the cases, law review articles and textbook comments in regard to oral invasion of privacy. Like the *Household Finance* case,

*Summit Loans* involved an oral invasion of privacy and turned upon the sufficiency of the evidence to be submitted to the jury. We held in *Household Finance* that there was no such sufficient evidence, but in *Summit Loans* that there was.

In *Household Finance,* we quoted with approval § 652 A of the *Restatement of the Law, Second, Torts,* as follows:

> "Professor Prosser is now the Reporter for the *Restatement,* covering the sections on invasion of privacy, and in Tentative Draft No. 13, published April 27, 1967, of the *Restatement of the Law, Second, Torts* there is found listed in § 652 A the four different *kinds* of invasions of privacy:
> '§ 652 A. *Meaning of Invasion of Privacy*
> The Right of Privacy is Invaded When There Is
> (a) Unreasonable intrusion upon the seclusion of another, * * *
> (b) Appropriation of the other's name or likeness, * * *
> (c) Unreasonable publicity given to the other's private life, * * *
> (d) Publicity which unreasonably places the other in a false light before the public, * * *.'
> "The text writers and authorities make it clear that an invasion of the right of privacy by anyone of the above four courses of conduct may give rise to a cause of action and, on occasion, there may be an overlapping or concurrent invasion by any or all of the above means working toward the injury of the plaintiff. *Restatement Second,* 652 A, Comment d."
> (252 Md. at 537-38, 250 A. 2d at 882-83.)

In all of the types of invasions of privacy, except perhaps "(b) Appropriation of the other's name or like-

ness," reasonableness under the facts presented is the determining factor. We inquire then whether, under the facts of the present case, the Beanes produced legally sufficient evidence from which a jury might conclude that the complaints of the McMullens, already described, were unreasonable, bearing in mind, of course, that the Beanes as the non-moving party in a motion for a directed verdict, are entitled to a resolution of any conflicts in the testimony in their favor and to the benefit of all reasonable inferences to be drawn from that testimony. *Katz v. Holsinger*, 264 Md. 307, 311, 286 A. 2d 115, 118 (1972).

As we have noted, Mr. Beane stated in his testimony that there had been 50 investigations inspired by the McMullens; but he gave no details in regard to these alleged complaints other than the specific complaints to various governmental officials already mentioned. Any alleged complaints other than those described could not be considered by the jury as unreasonable because there were no facts given in regard to them from which such a determination could be made. Indeed, in Count I of the Beanes' declaration, the alleged violations of their right to privacy are the complaints relating to an excessive number of families in the Beane home, the absence of a building permit for a porch improvement and the illegal dumping of trash on the Beane property, and no others.

First of all, it should be observed that the complaints in question were principally requests to the public authorities to investigate possible violations of the zoning and other county laws. These investigations did, in fact, result in the discovery by the county officials of some violations of the applicable law. For instance, the Park and Planning Commission concluded that the entire Beane fuel oil operation was a violation of the zoning ordinance and this finding was affirmed, in part, on appeal to the Board of Appeals and Mr. Beane was ordered to discontinue the use of the Beane property for the storage of oil tanks; but the Board of Appeals determined that he had a valid nonconforming use for the parking of oil trucks. In regard to the permit, it is uncontradicted that the build-

ing under the original permit had ceased for a substantial period of time and Mr. Beane was required to obtain a renewal permit. Nor can it be thought unreasonable to seek an investigation of a possible violation of the density provisions of the zoning ordinance permitting only one family when a property is occupied by 10 persons and has three separate dwelling units. The Beanes failed to offer sufficient evidence to enable a jury to conclude that these complaints were "unjustified" as alleged in Count I.

Secondly, these complaints were made *only* to governmental officials and not to the press, to neighbors or social friends of the Beanes so far as the evidence discloses. It is presumed that public officials will properly perform their duties. *Lerch v. Maryland Port Authority,* 240 Md. 438, 457, 214 A. 2d 761, 771 (1965). *See Clark v. Volatile,* 427 F. 2d 7 (3rd Cir. 1970). *Compare Sappington v. United States,* 408 F. 2d 817, 819 (4th Cir. 1969), *cert. denied,* 396 U. S. 876, 90 S. Ct. 150, 24 L.Ed.2d 133 (1969).

The record does not indicate any highhanded or oppressive conduct on the part of any county or other official in making the investigations. On the contrary, the McMullens—rather gently to be sure—thought that the requested investigations were made far too slowly and without much vigor on the part of the county officials. This was the principal complaint of Mrs. McMullen to Congressman Hogan and, here again, this complaint produced some accelerated action.

Thirdly, the tone of the complaints was not extreme or inflammatory. They were principally directed to the obtention of facts which likely would indicate a violation of the county ordinances. The complaints did not contain abrasive, scurrilous, or vile language. Their language was rather restrained.

Fourthly, there was no evidence sufficient to justify a jury in finding undue persistence by the McMullens in seeking relief from the county officials. They were firm,

but the relatively small number of established complaints, under the circumstances proved, did not indicate an undue or unreasonable persistence on the part of the McMullens. When they obtained the partial relief they sought, there were no further complaints directed to that type of relief.

In short, there was no evidence offered in the case from which a jury could conclude that the complaints of the McMullens were unreasonable or unjustified. The trial judge accordingly properly directed the verdict in favor of the McMullens on Count I in regard to the invasion of privacy.

2. *Interference with business.*

In Count II of the declaration the Beanes charged that the McMullens willfully, wantonly, maliciously, and without cause or justification interfered with Mr. Beane's right to pursue a lawful fuel oil distribution business by complaining to the public authorities of the County that the business "was not properly zoned and by giving misleading statements" to the authorities concerning facts with respect to Mr. Beane's operation of the business as a nonconforming use.

In Maryland it is well established that there may be recovery of damages resulting from malicious interference with the right to pursue a lawful business, trade or occupation. Our predecessors recognized this tort in *Lucke v. The Clothing Cutters & Trimmers Assembly,* 77 Md. 396, 26 A. 505 (1893). In *Willner v. Silverman,* 109 Md. 341, 355, 71 A. 962, 964 (1909), Judge Henry, for the Court, stated:

> "[A]ny malicious interference with the business or occupation of another, if followed by damage, is an actionable wrong."

The Court in *Willner* cited with approval the case of *Walker v. Cronin,* 107 Mass. 555, 562, decided by the Supreme Judicial Court of Massachusetts in 1871 and quoted

from the opinion in that case the elements of this tort which the plaintiff must prove, as follows:

" '(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice) and (4) actual damage and loss resulting.' "
(109 Md. at 355, 71 A. at 964.)

*See* 45 Am. Jur. 2d *Interference* §§ 3-6, at 281-85, § 14, at 290-92; 52 Am. Jur. *Torts* § 44, at 387-88; 86 C.J.S. *Torts* § 43, at 955-59. *See also* 16 A.L.R.3d 1191 *Prima Facie Torts.*

As Professor Prosser points out in *The Law of Torts,* at 954, note 4 (4th ed. 1971), however, there is a qualified privilege to interfere with a lawful business by complaints to the public authorities; but if the complaints are in bad faith or if the motive is spiteful, there is no protection under this qualified privilege. *See also* 1 Harper and James, *Law of Torts* §§ 6.11-6.12, at 510-17 (1956).

The Beanes contend that the complaint of the McMullens to the County Zoning authorities was predicated upon falsehood and hence was not in good faith and was motivated by spite in that the statements in the complaint indicated that no parking of trucks on the Beane property had occurred until 1963 whereas in their deposition (and allegedly at the hearing before the Board of Zoning Appeals) "they admitted that trucks were parked there as early as 1960-61." Our analysis of the record indicates that this contention is not correct. The testimony taken before the Board of Zoning Appeals is not in the record in this case and, of course, may not be considered by us.

The record does show that Mr. and Mrs. McMullen, on November 13, 1969, signed and forwarded to the Zon-

ing Enforcement Office of the County the following letter:

"Our property joins the property of Eugene C. Beane 1645 Ritchie-Marlboro Rd. I was asked to state when he first parked oil trucks on this property. It was not during the year 1959. I can't be too sure it was as early as 1963 that he began distributing business and started parking his oil trucks—but I do know that it has only been since last year that he started parking Family size tanks as well as one large one to be put underground. We never felt it proper for him to only have 'permit' for this type of business and no other commercial property in our neighborhood. We feel it surely degrades our property.

"Signed 11/13/69   /s/ Stephen & Virgie McMullen 1651—Ritchie-Marlboro Rd.

11/13/69   /s/ Richard C. Mabe — 1653 Ritchie-Marlboro Rd.

"Signed this 13 Day of Nov. 1969.
/s/ Albert L. Beall Notary for Prince Geo. County Md."

Counsel for the Beanes read into the record the testimony of Mrs. McMullen taken at her deposition on April 30, 1971, as follows:

"'Question. * * * Did there come a time when he had fuel oil, fuel trucks, fuel oil trucks?

"'Answer. Yes.

"'Question. When was that?

"'Answer. Off and on around '60 or '61.

"'Question. But there were, from time to time, fuel oil trucks parked there in '60 and '61; is that correct?

" 'Answer. Yes.
" 'Question. And that was when he was employed by Temple Hills Fuel Oil Company?
" 'Answer. I should say so.' "

It will be observed that the McMullens in the complaint of November 13, 1969, were most careful not to state any definite date when Mr. Beane *first* parked an oil truck on his property. They stated that it was not during the year 1959, but they *were not sure* it was as early as 1963 that he began his distributing business and "started parking his oil trucks." This obviously had to do with when Mr. Beane started in business for himself. In her deposition, Mrs. McMullen indicated that when he was employed by Temple Hills Fuel Company, he "off and on" in 1960 or 1961 parked fuel oil trucks on the property. This was a sporadic parking by an employee of a fuel oil company "from time to time." We see no inconsistency between the complaint and the deposition testimony.

Then, too, as we have already stated, the Park and Planning Commission found that no nonconforming use had been established in regard to either oil storage tanks or the parking of oil trucks and forbade the continuation of both. The Board of Zoning Appeals, however, found that the evidence did support a nonconforming use on one side of the Beane property for the parking of oil trucks, but otherwise affirmed the Park and Planning Commission. In short, the McMullens were successful on the more important issue and were partially successful in limiting the *scope* of the nonconforming oil truck parking use. The language of the complaint was not inflammatory, and the complaint was made to protect the property of the McMullens from what they reasonably thought was a neighboring commercial encroachment in a residential use zone. In our opinion, the trial court acted properly in concluding that there was no evidence from which the jury could find a malicious interference with the business of Mr. Beane. *See Small v. United States,*

333 F. 2d 702 (3rd Cir. 1964) ; *Appalachian Power Co.
v. American Institute of Certified Public Accountants,*
268 F. 2d 844 (2nd Cir. 1959), *cert. denied,* 361 U. S.
887, 80 S. Ct. 158, 4 L.Ed.2d 121 (1959).

3. *Slander of title.*

The first and apparently only case in Maryland in-
volving the slander of title to real property is *Gent v.
Lynch,* 23 Md. 58 (1865). In *Gent,* the plaintiff owner of
the land had offered it for sale at public auction. The de-
fendant, claiming that he owned the land as a result of
a sale by a constable, stopped the plaintiff's sale at public
auction. Defendant stated that his counsel had advised
him that he owned the property, the sale by the constable
to the defendant having been reported to the court and
ratified. This information was untrue as counsel for the
defendant later discovered by an examination of the court
papers. Counsel told the defendant of the true state of
the case and the defendant stated that "he had been al-
together misinformed, but admitted he had never paid
the purchase money." The Court held that the lower court
was correct in submitting the question of malice and bona
fides to the jury on the part of the defendant which was
done by the eighth prayer *granted by consent.* The Court
did not find it necessary to discuss the elements of the
tort of slander of title which the plaintiff must prove. *Cf.*
in regard to slander of personal property, *Lehigh Chemi-
cal Co. v. Celanese Corp. of America,* 278 F. Supp. 894
(Md. 1968) ; *Hopkins Chemical Co. v. Read Drug & Chem-
ical Co.,* 124 Md. 210, 92 A. 478 (1914).

In Prosser, *Law of Torts,* at 919-920 (4th ed. 1971), it
is stated:

> "Injurious falsehood, or disparagement, then,
> may consist of the publication of matter deroga-
> tory to the plaintiff's title to his property, or its
> quality, or to his business in general, or even to
> some element of his personal affairs, of a kind
> calculated to prevent others from dealing with

him, or otherwise to interfere with his relations with others to his disadvantage. The cause of action founded upon it resembles that for defamation, but differs from it materially in the greater burden of proof resting on the plaintiff, and the necessity for special damage in all cases. The falsehood must be communicated to a third person, since the tort consists of interference with the relation with such persons. But the plaintiff must plead and prove not only the publication and its disparaging innuendo, as in defamation, but something more. There is no presumption, as in the case of personal slander, that the disparaging statement is false, and the plaintiff must establish its falsity as a part of his cause of action. Although it has been contended that there is no essential reason against liability where even the truth is published for the purpose of doing harm, the policy of the courts has been to encourage the publication of the truth, regardless of motive.

"In addition, the plaintiff must prove in all cases that the publication has played a material and substantial part in inducing others not to deal with him, and that as a result he had suffered special damage. The analogy is thus to the kind of personal slander which does not charge a crime or loathsome disease, or defame him in his business, profession, or office, and so is not actionable unless damage is proved."
(*Id.* at 919-20.)

Professor Prosser also states:

"There is liability when the defendant acts for a spite motive, and out of a desire to do harm for its own sake; and equally so when he acts for the purpose of doing harm to the interests of the plaintiff in a manner in which he is not privileged so to interfere. There is also liability

when the defendant knows that what he says is false, regardless of whether he has an ill motive or intends to affect the plaintiff at all. The deliberate liar must take the risk that his statement will prove to be economically damaging to others; and there is something like the 'scienter' found in an action of deceit. Any of these three is sufficient to constitute 'malice' and support the action. But in the absence of any of the three there is no liability, where the defendant has made his utterance in good faith, even though he may have been negligent in failing to ascertain the facts before he made it."
(*Id.* at 921-22.)

See 50 Am. Jur. 2d *Libel and Slander* §§ 539-51, at 1058-69; 53 C.J.S. *Libel and Slander* §§ 269-79, at 391-404; 1 Harper and James, *The Law of Torts* §§ 6.1-6.3 at 474-86 (1956); 3 Restatement, *Torts* §§ 624-25, at 325-32, § 629 at 338-42 (1938).

The Beanes contend that Mrs. McMullen "impliedly" gave the County officials authority to place the drainage pipe involved in this case upon their property and thus "slandered the title" of the Beanes. We, like the trial court, find no support for this contention in the record.

Arthur C. Richards, Bridge Superintendent of the County Department of Public Works, was summoned by the Beanes and testified in relevant part:

"Q. All right. There came a time when you took the drainage pipe down in front of Mrs. McMullen's yard; is that correct? A. Took it all the way from up at the intersection of Sansbury Road down on through McMullen's property—on McMullen's property.

"Q. To McMullen's property? A. That's where it was supposed to go first.

"Q. Did you go any farther? A. We did.

"Q. All right. How much farther did you

go? A. I imagine we went close to 70 feet below that.

"Q. Below there. Did you have anybody's permission to do that? A. No. We went into Mrs. McMullen's house and asked could we move her driveway and she said it was all right with her. That was all that was said.

"Q. In other words, you could straighten her driveway; is that what you are saying? A. Yes, we could straighten it."

Both Mr. Beane and his son, Elwood, testified that the McMullen driveway is located some 30 to 40 feet from the Beane property.

It seems clear to us that Mrs. McMullen, in response to a request from a county official, gave permission to straighten *her* driveway and did not purport to give any permission whatever to the County, through Mr. Richards, to do anything whatever on the Beane land; and no reasonable implication that she attempted to do this can be implied from what she said. There was no showing by the Beanes of falsity or malice by the McMullens so that the trial court, in our opinion, acted properly in directing the verdict in favor of the McMullens on Count III in regard to alleged slander of title.

4. *Dismissal of the Beanes' counterclaim to the Mc-Mullens' counterclaim in regard to water damage.*

In their counterclaim to the counterclaim of the Mc-Mullens against them, the Beanes claimed that they had suffered actual damages of $100,000.00 and $50,000.00 punitive damages from the willful and wrongful action of the McMullens in collecting various surface waters which did not naturally flow on the Beane land into a man-made ditch and pipe and cast it upon the Beane land, relying upon our decision in *Battisto v. Perkins,* 210 Md. 542, 546, 124 A. 2d 288, 290 (1956) that an "upper owner cannot, with impunity, artificially increase or concentrate the natural flow" of water and damage the

lower owner as a result of this. At the end of the proof of the Beanes on their counterclaim, the McMullens moved for a directed verdict in their favor which the trial court granted.

The following colloquy between the trial court and Mr. Leonnig, counsel for the Beanes, posed the contention of the Beanes on the facts relative to their position in this regard:

> "THE COURT: Where in any of this evidence that I am now considering is there any indication that Mr. McMullen had anything to do with any of this drainage?
>
> "MR. LEONNIG: They gave permission.
>
> "THE COURT. You use that word collectively. Where in the evidence did Mr. McMullen give permission to anybody? I am talking about the evidence, not what you think he did. Where in the evidence? Be specific.
>
> "MR. LEONNIG: There is nothing in the evidence.
>
> "THE COURT: As to Stephen.
>
> "MR. LEONNIG: As to Stephen.
>
> "THE COURT: Absolutely none.
>
> "MR. LEONNIG: That's correct.
>
> "THE COURT: Very well. Now, where is the evidence in this case as to what she did to collect this water?
>
> "MR. LEONNIG: She gave them permission to put that pipe across—
>
> "THE COURT: Her driveway.
>
> "MR. LEONNIG: Across her land, obviously fully realizing that it had to be dumped on the plaintiffs' side.
>
> "THE COURT: This is the evidence you are relying on, her permission to Mr. Richards to straighten her driveway? That is your evidence?
>
> "MR. LEONNIG: Sure. Yes.
>
> "THE COURT: Very well. The Court will

grant the motion for directed verdict as to the McMullens in the counterclaim of the Beanes against the McMullens.

"First, as to Stephen McMullen, there is absolutely no evidence in this case whatsoever as to him. Secondly, the counter-plaintiff contends that the only evidence on behalf of Mrs. McMullen was her permission to Mr. Richards, who was the supervisor of the county roads system, to straighten out her driveway. The Court recollects specifically that we dealt with that testimony several times, and that is all he asked for and that is all he got.

"The Court rules as a matter of law that there is no credible evidence in this case here as to this trespass for unnatural diversion and/or collection of excessive water by the McMullens in this case."

We have already considered the meaning of Mrs. McMullen's permission to straighten her driveway and her statement to Mr. Richards does not indicate any permission to the County to put in the drainage pipe in the place of the existing ditch and dump water on the Beane property. Evidence is lacking *that the McMullens* artificially increased or concentrated the natural flow of water toward the Beane land. As the trial court properly ruled, there was simply no evidence to sustain the contention of the Beanes in support of their counterclaim.

5. *Sufficiency of the injunctive relief.*

As we have indicated, the trial judge originally stated that he would deny all injunctive relief. After reading several of our opinions, however, the trial judge changed his mind in this regard and decided that he should take additional testimony to determine the scope of the injunctive relief. The Beanes objected to this, contending that the verdict of the jury for $2,000.00 in their favor

and the ultimate judgment on the verdict, concluded the issues in regard to the wrongful channelization and increase of the flow of surface water onto their property and that this condition resulted in substantial damage to the Beanes. Hence, say the Beanes, the trial court should proceed to fashion the equitable relief based upon the decided premises mentioned. Although, as we will later more fully consider, it was not an abuse of discretion for the trial court to take additional testimony in regard to the practical ways in which injunctive relief might be fashioned, we are of the opinion that the trial court was not at liberty to disregard the premises already established by the verdict and judgment. Subtitle BF of the Maryland Rules provides for "MANDAMUS AND INJUNCTION AS ANCILLARY RELIEF IN AN ACTION AT LAW" and Rule BF43, entitled "Equitable Principles Applicable to Claim for Injunction," provides:

> "In determining whether or not an injunction shall be granted pursuant to this Subtitle, the court shall apply the same tests and standards as would be applied in an action in equity."

Rule BF43 does not mean that, in considering injunctive relief ancillary to the action at law, the trial court is to proceed as if the granting of injunctive relief were a matter *de novo* in equity with the right to the trial judge to disregard or reach conclusions contrary to the factual matters already determined by the jury. In short, the jury's factual findings—either upon a special verdict or inherent in a general verdict—are conclusive in regard to those facts as if the trial court sitting as a trier of fact had so found. If it be concluded that the jury had no substantial evidence upon which to reach its verdict, the remedy is by the granting of a judgment n.o.v. If there were other deficiencies in the verdict, a new trial could be granted. In the present case, the trial court, properly we think, declined to grant the County's motion for a judgment n.o.v., concluding that there was

legally sufficient evidence to support the verdict. The County made no motion for the granting of a new trial and no new trial was granted. Thus the verdict and judgment became final and no appeal from the judgment was taken to this Court.

There was a conflict in regard to the County's undue channelization of the surface water, its increased amount and velocity, as well as in regard to its damaging effect upon the Beane property. The evidence offered on behalf of the Beanes indicated that prior to the improvement of Sansbury Road by the County and the subsequent installation of the pipe from that road to the Beane property, the only land which drained into the old roadbed was that of the McMullens and perhaps the land of the Mabes next to the McMullen land. It indicated that there was no sloping ditch from Sansbury Road to the Beane property and this was corroborated by Charles Baumann, a disinterested witness, familiar with the neighborhood, who had been called as a witness by the McMullens. It also indicated that after the pipe and catch basins along Ritchie-Marlboro Road had been installed, water continually stood in the old roadbed. This condition had not existed prior to the installation. Indeed, George Martin, a witness for the County, testified that the difference between the runoff of water of a gravel road and a macadam road was that the former was 60% of the latter.

The County and the McMullens, on the other hand, introduced evidence to show that there was a sloping ditch from Sansbury Road of approximately two feet to the Beane property where its depth was some eight feet. The County also offered evidence to show that there was no increase in the drainage area as a result of the installations of catch basins and the pipe. The jury believed the Beane testimony, found a verdict for the Beanes and awarded $2,000.00 damages against the County.

Accepting the facts implicit in the jury's verdict as established in the case, the Beanes would be normally entitled to an injunction against the County to alleviate

the increased flow of surface water upon their land resulting from the canalization of surface water by the County's installation of the catch basins and pipe, *Baer v. Board of County Commissioners of Washington County,* 255 Md. 163, 257 A. 2d 201 (1969). See also *Grant v. Katson,* 261 Md. 112, 274 A. 2d 88 (1971), citing *Baer* with approval.

The Beanes urged the lower court to issue a mandatory injunction to compel the County either to (1) remove the pipe and catch basins and restore the drainage to its status prior to the installations, or (2) carry the present pipe forward through the Beane property and have the water deposited in a suitable place. Counsel for the Beanes offered to confer with the County officials in regard to possible other solutions to the problem if the county officials thought the recommended solutions to be too expensive or impracticable. This offer, however, was not pursued; and the trial court passed an order on September 7, 1971, providing as follows:

> "This matter having come on for jury trial on July 12, 1971, and said trial having extended to and including July 16, 1971, at which time a judgment was entered in favor of the Counter-Claimants, EUGENE C. BEANE, SR., and MARY BEANE, his wife, against the Counter-Defendant, PRINCE GEORGE'S COUNTY, MARYLAND, the request for injunctive relief having been ultimately taken under advisement, and there having been had a further hearing on the request for injunctive relief on the 26th day of August, 1971 over the objection of the Counter-Claimants, EUGENE C. BEANE, et ux., at which time testimony was taken and exhibits considered, it is this 7th day of September, 1971, by the Circuit Court for Prince George's County
>
> "ORDERED, that the prayer of both EUGENE C. BEANE, and MARY BEANE, his

wife, for injunctive relief is granted to the extent that the Counter-Defendant, PRINCE GEORGE'S COUNTY, MARYLAND, be and it is hereby ordered to remove that portion of the drainage pipe installed on the property of EUGENE C. BEANE and MARY BEANE, his wife, from the westerly property line of the Counter-Defendants, McMULLENS, to the westerly terminus of said drainage pipe, all as more particularly shown on Exhibit 4 introduced at the hearing held on August 26, 1971, and is further

"ORDERED that any further claim for injunctive relief be and it is hereby denied."

We observe, *in limine,* that the order, in form, does not comply with Rule BB78 a, which provides:

"An order granting an injunction shall set forth the reasons for its issuance; shall be specific in terms; and shall describe in reasonable detail, and not by reference to the complaint or other document, the act sought to be required or commanded or restrained or forbidden."

Although the prior proceedings indicating why injunctive relief was being given in an action at law are given, no "reasons" for the issuance of the injunction are set forth as the Rule requires. Then, too, the court, in noting the location of the portion of pipe to be removed, refers to Exhibit 4 introduced at the hearing held on August 26, 1971, which is another "document," the use of which is forbidden by the Rule with respect to supplying the particulars of the Act commanded to be done. The relevant portion of Exhibit 4 could have been reproduced, relevant explanations inserted upon the reproduction and the plat so produced attached to the order and incorporated in it by reference to an appropriate legend placed upon the reproduction. But this was not done. Inasmuch as this aspect of the case must be re-

manded for further proceedings, in any event, the order ultimately passed can be made to conform to the provisions of Rule BB78 a.

More importantly, however, is the failure of the order for the granting of the injunction to grant the Beanes any substantial relief from the canalization of the surface water and its increased flow over and above the natural flow of such water prior to the County installations. It is true that the removal of the 40 feet of pipe on the Beane land—placed there without the consent of the Beanes and obviously a continuing trespass—does abate a continuing trespass of that 40 feet of pipe; but it does nothing to abate or relieve the abnormal and unlawful flow of water on the property of the Beanes. Indeed, as a result of the order, 40 feet *more* of the Beane land will be subject to the abnormal and unlawful flow of water!

No specific consideration was given by the trial court to any principle of comparative hardship although this was urged by the County as a possible reason to deny equitable relief. The doctrine of comparative hardship is available for consideration in considering injunctive relief in actions at law. *Dundalk Holding Co. v. Easter,* 215 Md. 549, 137 A. 2d 667, *cert. den.* 358 U. S. 821, *reh. den.* 358 U. S. 901 (1958). On this question, there was testimony in the present case by Henry M. Eldridge, a registered surveyor, a witness for the Beanes, that the installation of a 21 inch pipe for 763 feet would cost $4,435.00, whereas the County evidence indicated that the estimated cost would be some $32,000.00 to continue the pipe down to Fernwood Road. There were, however, no specifications or definitive data given so that these figures, at best, do not appear to be especially helpful in determining any question of comparative hardship.

In view of all the circumstances, we will reverse the order of September 7, 1971, and remand the case to the lower court for the purpose of taking additional testimony, if required, in order to fashion an order, in proper form, to give more complete relief to the Beanes, in addition to the removal of the 40 feet of pipe from their

land, from the abnormal and unlawful flow of water on the Beane property resulting from the County installations, unless some doctrine of equity precludes injunctive relief in which event the Beanes would be enabled to proceed, without prejudice, to recover recurring damages resulting from such installations subsequent to July 21, 1971, when the $2,000.00 judgment should have become final.

*Miscellaneous Contentions.*

In addition to the five principal questions, already considered, three additional questions should be briefly considered.

(a) The Beanes contended below and before us that the trial judge should have disqualified himself from considering injunctive relief in the present case because of alleged "prejudice and lack of impartiality." We have reviewed the record and it does not disclose that the trial judge was prejudiced or lacked impartiality. The trial judge conducted the trial with a "tight rein" but we perceive no partiality between parties or counsel for parties. The trial judge did indicate that his view of the facts was different from that of the jury; but he declined to grant the County's motion for a judgment n.o.v., properly observing that having decided previously in ruling on the motions for a directed verdict that there was sufficient evidence to submit to the jury, he would not substitute his judgment on the facts for the judgment of the jury. It is true that he expressed his opinion that the jury came to a conclusion different on the facts from his, but we have held that the expression by the trial judge of an opinion in regard to the case is not necessarily a ground for disqualification. *See Costello v. State,* 237 Md. 464, 206 A. 2d 812 (1965) and *County Commissioners for Charles County v. Wilmer,* 131 Md. 175, 101 A. 686 (1917).

(b) *The holding of a further hearing on injunctive relief.*

The Beanes vigorously contended below and again be-

fore us that inasmuch as the basic factual matters were determined by the jury's verdict and consequent judgment, the trial court erred in holding a further hearing, *sua sponte* in regard to injunctive relief. We have already indicated that the jury's verdict and the judgment entered on it did determine the facts implicit in the verdict; but it does not follow from this that the trial court should not require additional evidence to frame injunctive relief, applying equitable principles as Rule BF43 states should be done. The trial judge stated to counsel for the Beanes:

> "And if you can't tell me where this old road ran and whether it was in fact a drainage area and where the property line physically was, and what each was claiming, it would be impossible for me to phrase any injunction, if I determined that the injunction that you prayed for was appropriate."

We have held that a chancellor has the power, and indeed the duty, to allow defects in proof to be supplied at any time and that his action in so doing will only be reversed if his action is arbitrary. *Bradford v. Eutaw Savings Bank,* 186 Md. 127, 46 A. 2d 284 (1946). In our opinion, the same rule should apply when ancillary injunctive relief is requested in actions at law in view of the provisions of Rule BF43; and the trial court may and should act, *sua sponte* in this regard when in his opinion the ends of justice will be served. We perceive no arbitrary conduct here. On the contrary, the trial judge had preliminarily announced his denial of the requested injunctive relief, changed his mind, and took the additional testimony with a view of possibly granting injunctive relief which, indeed, was granted to a limited extent.

(c) *The admission into evidence of Injunctive Hearing Exhibit 3.*

Phillip T. Regan, Chief of the Division of Highway

and Bridge Design for the County's Department of Public Works, identified a copy of a construction plan prepared by the Washington Suburban Sanitary Commission, and dated August 13, 1965, for construction of the water line laid on the Ritchie-Marlboro Road along the front of the Beane property, the construction being done in 1965 and 1966. Mr. Regan testified that the Sanitary Commission normally sent the County Department of Public Works plans for any water and sewer construction or storm drainage which the Commission prepared for any road in the County under the jurisdiction of the County's Department of Public Works. The Department keeps the plats in its office under Mr. Regan's supervision; and he testified that they were "kept in the ordinary course of business." The trial court, over the objection of counsel for the Beanes, admitted the plat into evidence as a document kept in the ordinary course of business under Code (1971 Repl. Vol.) Art. 35, § 59. *See also* Art. 35, § 60, the "Uniform Photographic Copies of Business and Public Records as Evidence Act."

As we stated in *Smith v. Jones*, 236 Md. 305, 309, 203 A. 2d 865, 867-868 (1964) :

> "Section 59, Article 35, Code (1957), as construed by this Court, permits introduction of business records even though hearsay in nature, when the entry meets the tests of 'necessity and circumstantial guaranty of trustworthiness.' *Morrow v. State*, 190 Md. 559, 59 A. 2d 325 (1948)."

*See also Burroughs International Co. v. Datronics Engineers, Inc.*, 254 Md. 327, 255 A. 2d 341 (1969).

In our opinion, the plat in question was made and kept in the regular course of business within the meaning of Art. 35, § 59. The objections of the Beanes went to its *weight* rather than to its *admissibility* in the light of the statute.

Inasmuch as the case will be remanded, the Beanes will no doubt be permitted to summon those who actually

prepared the plat for the Commission and examine them on all relevant matters in connection with the plat, if they so desire.

*Judgments for costs (a) in favor of the appellees, Stephen McMullen and Virgie E. McMullen, his wife, on the three counts of the declaration and (b) in favor of the McMullens on the counterclaim of the appellants, Eugene C. Beane, Sr. and Mary Beane, his wife, affirmed; the order of September 7, 1971, in regard to injunctive relief, reversed and the case remanded for further proceedings in accordance with this opinion; the costs to be equally divided, the appellants, Eugene C. Beane, Sr. and Mary Beane, his wife, to pay one-half and the appellee, Board of County Commissioners for Prince George's County, to pay the remaining one-half.*